UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KNAUF INSULATION, LLC,<br>KNAUF INSULATION GmbH,<br>KNAUF INSULATION SPRL,<br><br>                Plaintiffs,<br><br>                v.<br><br>JOHNS MANVILLE CORPORATION,<br>JOHNS MANVILLE, INC.,<br><br>                Defendants.<br><br>JOHNS MANVILLE CORPORATION,<br>JOHNS MANVILLE, INC.,<br><br>                Counter Claimants,<br><br>                v.<br><br>KNAUF INSULATION GmbH,<br>KNAUF INSULATION SPRL,<br>KNAUF INSULATION, LLC,<br><br>                Counter Defendants. | Case No. 1:15-cv-00111-TWP-MJD |

**SEALED ORDER ON DEFENDANTS' MOTION TO EXCLUDE
THE OPINIONS OF PARASTOO AZADI, PH.D.**

This matter is before the Court on Defendants Johns Manville Corporation and Johns Manville, Inc.'s (collectively, "JM") Motion to Exclude the Opinions of Parastoo Azadi, Ph.D. ("Azadi") (Filing No. 929). JM seeks to preclude Azadi from characterizing certain chemical compounds in JM's accused products as "melanoidins" and from testifying about a "leach test" she performed on those products. For the following reasons, Knauf's Motion to Exclude is **granted in part and denied in part**.

## I.    BACKGROUND

Plaintiffs Knauf Insulation LLC, Knauf Insulation GmbH, and Knauf Insulation SPRL (collectively, "Knauf") and JM are competitors in the U.S. market for fiberglass insulation products. Knauf initiated this patent infringement action against JM, alleging JM has violated and is continuing to violate the patent laws of the United States by infringing Knauf's U.S. Patents.

According to JM, "[t]he presence of a 'Maillard reaction' is a requirement across all asserted patent claims in this case" (Filing No. 929-1 at 7). The chemical product of a Maillard reaction is a "melanoidin."[1] Knauf intends to offer testimony from Azadi that JM's accused products contain melanoidins. JM anticipates that Knauf will argue that the presence of melanoidins proves that JM's products undergo a Maillard reaction (Filing No. 929-1 at 7). JM has moved to preclude Azadi from testifying as to whether JM's accused products contain melanoidins, arguing that Azadi is not an expert on Maillard chemistry. *Id.*

Additionally, the asserted claims for two of the patents-in-suit—Patent Nos. 8,940,089 (the " '089 patent") and 9,039,827 (the " '827 patent")—require that the finished insulation materials contain more than a minimum concentration of certain chemical compounds, as ascertained via a "leach test." *Id.* at 10. Azadi performed a leach test on JM's products, and her test results purportedly show that JM's products contain more than the minimum concentration of the compounds. JM moves to preclude Azadi's leach test results as irrelevant and unreliable. *Id.*

---

[1] In their Joint Claim Construction and Prehearing Statement, the parties dispute the construction of the term "melanoidin" (Filing No. 819 § (b), app. B1 at 48). Knauf proposes the construction "A chemical product of a Maillard reaction," and JM proposes the construction "a chemical product of a Maillard reaction between a reducing sugar and an amine reactant." *Id.* at app. B1 at 48. The Court has not yet ruled on the parties' claim constructions, but the parties appear to agree that a "melanoidin" is, at least in part, the "chemical product of a Maillard reaction." The Court therefore adopts this construction only for purposes of the instant Motion to Exclude (Filing No. 929). Because an order *in limine* is not a final appealable order, the parties may file additional motions *in limine* regarding Azadi's melanoidin testimony following the Court's ruling on the construction of "melanoidin," if needed.

## II.     LEGAL STANDARD

"[J]udges have broad discretion in ruling on evidentiary questions during trial or before on motions in *limine*." *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). The court excludes evidence on a motion in *limine* only if the evidence clearly is not admissible for any purpose. *See Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). Unless evidence meets this exacting standard, evidentiary rulings must be deferred until trial so questions of foundation, relevancy, and prejudice may be resolved in context. *Id.* at 1400–01. Moreover, denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion is admissible; rather, it only means that, at the pretrial stage, the court is unable to determine whether the evidence should be excluded. *Id.* at 1401. "The purpose of a motion in *limine* is not to weigh competing arguments about the strength of the parties' evidence and theories, nor is it to decide which party's assumptions are correct. A motion in *limine* weeds out evidence that is not admissible for any purpose." *Wash. Frontier League Baseball, LLC v. Zimmerman*, No. 14-cv-01862, 2018 WL 3120623, at *2 (S.D. Ind. June 26, 2018).

Federal Rule of Evidence 702 governs testimony of expert witnesses. An expert may testify regarding the ultimate issue in a case. Fed. R. Evid. 704(a). Furthermore, an expert can base her opinion on inadmissible evidence. Fed. R. Evid. 703. However, "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

"Under the *Daubert* gatekeeping requirement, the district court has a duty to ensure that expert testimony offered under Federal Rule of Evidence 702 is both relevant and reliable." *Jenkins v. Bartlett*, 487 F.3d 482, 488–89 (7th Cir. 2007) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "Whether proposed expert testimony is sufficiently reliable under Rule 702 is dependent upon the facts and circumstances of the particular case." *Id.* at 489. The court

is given "latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citing *Jenkins*, 487 F.3d at 489).

"In determining reliability, *Daubert* sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the scientific community." *Id* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)). "The court should also consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion." *Id.*

> Since the gatekeeping inquiry must be tied to the facts of the particular case, . . . a trial court may - but is not required to - consider "one or more of the more specific factors that *Daubert* mentioned when doing so will help determine the testimony's reliability." But, the [Supreme] Court stressed, those factors, which were meant "to be helpful, not definitive," "neither necessarily nor exclusively apply to all experts or in every case." Their applicability will depend on "'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" The procedure employed will depend largely on the "particular circumstances of the particular case at issue."

*Richman v. Sheahan*, 415 F. Supp. 2d 929, 934 (N.D. Ill. 2006) (quoting *Kumho Tire*, 526 U.S. at 142, 150, 152).

Additionally, the district court must determine whether the proposed expert testimony will assist the trier of fact in determining a fact in issue or understanding the evidence. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616.

> Vigorous cross examination, presentation of contrary evidence and careful jury instructions . . . are the traditional and appropriate means of attacking shaky but admissible evidence. The rejection of expert testimony is the exception rather than

the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.

*Richman*, 415 F. Supp. 2d at 933 (citations and quotation marks omitted).

Seventh Circuit law governs this Motion to Exclude, as opposed to Federal Circuit law, because the admission of expert witnesses is a procedural matter and is not unique to patent law. *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1358 (Fed. Cir. 2006); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

### III.   DISCUSSION

The Court will first address JM's request to exclude Azadi's testimony regarding "melanoidins" and then JM's request to exclude Azadi's testimony regarding her "leach test".

**A.   Melanoidins**

In her report, Azadi identifies certain chemical compounds in JM's products and then opines that those compounds are "more likely than not" "melanoidins" and/or "chemical intermediates that are formed in pathways that produce melanoidins" (together, "melanoidins") ([Filing No. 929-1 at 6](#) (citing [Filing No. 929-3 at 8](#))). Azadi's characterization of the compounds as melanoidins is based on literature identifying those compounds as Maillard intermediates in other types of chemical reactions. *Id.* at 10.

JM clarifies that it is not moving to exclude Azadi's identification of the chemical compounds and concedes Azadi is qualified to do so. JM moves to preclude Azadi from characterizing those compounds as melanoidins. *Id.* at 7. Azadi admits she is not an expert in Maillard chemistry or polymer chemistry. *Id.* at 9. JM argues Azadi is therefore not qualified to identify melanoidins, which are the chemical products of Maillard reactions. Stated differently, Azadi is not qualified to determine whether a Maillard reaction occurred, so she cannot testify as to whether certain compounds are the result of a Maillard reaction—*i.e.*, are melanoidins.

5

In response, Knauf argues that Azadi is qualified to identify melanoidins (Filing No. 940 at 2). Azadi identified the chemical compounds in JM's products, which is her area of expertise, and then appropriately "'matched [those compounds] with known melanoidin intermediates from sources' based upon prior scientific literature in the field." *Id.* Knauf contends that Azadi "is not opining on the *nature* of a Maillard reaction," and is only stating that her tests "identified molecules which are known to be Maillard intermediates formed in pathways that produce melanoidins according to the literature in the field." *Id.* at 2–3 (emphasis in original).

On reply, JM insists that even though Azadi is qualified to identify chemical compounds, she is not qualified to "take the next step" of characterizing those compounds as melanoidins (Filing No. 964 at 5). JM further argues that the literature relied on by Azadi is irrelevant because it involves food-based chemical reactions, and not fiberglass insulation binder reactions; and "at most, the literature suggests that a particular compound *could* be the product of a Maillard reaction in a different context with different starting ingredients." *Id.* (emphasis in original).

The Court partially agrees with JM. Assuming that melanoidins are, by definition, the products of Maillard reactions, Azadi is not qualified to opine as to whether certain compounds in JM's products are melanoidins, or even the likelihood that those compounds are melanoidins. To make that determination, Azadi would need to be qualified to opine that a Maillard reaction occurred, and she admittedly is not so qualified.

However, the Court finds that Azadi is qualified to testify that prior literature in her field has identified certain chemical compounds as melanoidins—*i.e.*, that the compounds could be melanoidins. JM has not argued that the literature relied on by Azadi is not of the type reasonably relied upon by experts in her field. Fed. R. Evid. 703. JM does argue that the literature is "irrelevant" because it discusses food-based reactions instead of fiberglass insulation binder

6

reactions, (Filing No. 929-1 at 12), but the soundness of Azadi's reliance on food-based literature speaks to the weight of her testimony, not its admissibility. JM will have an opportunity at trial to challenge Azadi's reliance on food-based literature during cross-examination and through the introduction of contrary evidence. *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013) ("Assuming a rational connection between the data and the opinion . . . an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility. 'Our system relies on cross-examination to alert the jury to the difference between good data and speculation.'" (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432 (7th Cir. 2013))).

The Court therefore **grants in part and denies in part** JM's request to exclude Azadi's testimony on melanoidins. Azadi may testify that the compounds she identified in JM's accused products could be melanoidins based on prior literature in the field. However, Azadi is precluded from opining as to whether, or the likelihood that, those compounds are melanoidins.

B.  **Leach Test**

JM also seeks to preclude testimony from Azadi regarding a "leach test" she performed on a sample of JM's products, arguing the test results are irrelevant and unreliable (Filing No. 929-1 at 13). JM's relevance and reliability arguments are intertwined with one of JM's defenses to the asserted claims for the '089 and '827 patents, so some background information regarding those claims and JM's defense is needed to contextualize JM's request to exclude the leach test evidence.

The asserted claims for the '089 and '827 patents each require that "the finished material comprises residual levels of more than 500 mg of ionic species per kg of finished material . . . *in which the residual levels are assessed in a leach test*" (Filing No. 2 at 14; Filing No. 60-1 at 14). The common specifications for the '089 and '827 patents provide one example of a leach test that

7

can be used to measure the residual levels of ionic species—the British standard BS EN 12457-2 at L/S10 (the "British Standard test") (Filing No. 929-1 at 13).

JM has argued that the '089 and '827 patents are invalid because the phrase "the residual levels are assessed in a leach test" is indefinite. *Id.* at 14; (Filing No. 843 at 93 (arguing that patents are invalid if indefinite)). In response to this defense, Knauf has argued that the '087 and '827 patents are not indefinite because they describe the British Standard test as an appropriate leach test, and there is no ambiguity in applying the British Standard test (Filing No. 929-1 at 14; Filing No. 862 at 23). Since Knauf's response relies on the use of the British Standard test, JM argues that any leach tests by Knauf's experts other than British Standard tests are irrelevant.

JM contends that Azadi's leach test was not a British Standard test because it failed to follow the British Standard protocol on sample size. The British Standard test calls for the use of a ninety-gram sample (Filing No. 929-1 at 14–15). Azadi used only a nine-gram sample in her leach test because her testing equipment could not physically accommodate a ninety-gram sample (Filing No. 940 at 6–7). JM argues that the difference in sample size means that Azadi's leach test is not a British Standard test and is therefore irrelevant to the '087 and '827 patent claims. JM also argues that Azadi's departure from the British Standard protocols, and her failure to show that her leach test results are comparable to British Standard test results, make her leach test unreliable.

Knauf responds that Azadi's leach test is a British Standard test and is reliable because Azadi followed all of the British Standard protocols, except for the sample size (Filing No. 940 at 5–11). Knauf also notes that Azadi conducted a "comparability study" between her leach test and a British Standard test, which determined that Azadi's nine-gram test did not yield significantly different results than a ninety-gram test would yield. However, Azadi has not provided any details

8

about her comparability study. JM contends that the lack of information about Azadi's comparability study makes it unreliable.

There are three issues the Court must resolve: (1) whether Azadi should be precluded from stating her leach test results came from a British Standard test or equivalent test, and from mentioning her comparability study; (2) whether Azadi's leach test results are relevant; and (3) whether Azadi's leach test results are reliable.

### 1. Whether the Leach Test Results Came from a British Standard or Equivalent Test

JM argues Azadi should be precluded from stating her leach test results were produced using a British Standard test or equivalent test because she failed to use a ninety-gram sample and failed to show that her leach test results were equivalent to the results of a British Standard test (Filing No. 929-1 at 15–16). In response, Knauf contends that Azadi followed all of the British Standard protocols, except the sample size protocol, and used well-accepted processes in her testing (Filing No. 940 at 5–7). Knauf also notes that Azadi testified during her deposition that she defines "significantly different" results as having a greater than fifteen percent difference, and that she did not find a significant difference between the results of her nine-gram test and the results of a ninety-gram test. *Id.* at 9. On reply, JM argues that Knauf's response does not change the fact that Azadi failed to use the ninety-gram sample size called for by the British Standard test, and still fails to provide any information about Azadi's comparability study.

The Court agrees with JM in both respects. Despite the limitations imposed by Azadi's testing equipment, Azadi's leach test did not follow all of the British Standard test protocols, so her leach test cannot be considered a British Standard test. Additionally, the only proffered information about Azadi's comparability study are her statements that she conducted the study and that, based on her study, the results of her leach test did not significantly differ from the results of

9

a British Standard test. These conclusory statements offer no information about the comparability study's methodology and leave the Court unable to determine whether it can or has been tested, whether it has been subjected to peer review, or whether it is generally accepted. *Gayton*, 593 F.3d at 616. Azadi's comparability study is therefore not reliable and does not provide a basis for Azadi's opinion that her leach test produced results equivalent to a British Standard test.

Accordingly, the Court **grants** JM's request to preclude Azadi from stating that her leach test results came from performing the British Standard test or an equivalent test, and to preclude Azadi from mentioning her comparability study.

### 2. Whether Azadi's Leach Test Results are Relevant

JM contends that because Azadi's leach test is not a British Standard test, and only British Standard tests are relevant to JM's indefiniteness defense to the asserted claims on the '089 and '827 patents, Azadi's leach test results are irrelevant. However, JM's burden on a motion *in limine* is to show that the results of Azadi's leach test would not be admissible for any purpose. *See Wash. Frontier League Baseball, LLC*, 2018 WL 3120623, at *2. Although Azadi's leach test might not support Knauf's response to one of JM's defenses as to two asserted patent claims, the Court cannot conclude at this stage that such evidence would not be admissible for any purpose, particularly because the parties' motions for partial summary judgment and claim construction remain pending. Questions regarding the relevance of Azadi's leach test are best resolved in the context of trial. The Court therefore **denies** JM's request to exclude Azadi's leach test results as irrelevant.

### 3. Whether Azadi's Leach Test Results are Reliable

JM lastly argues that Azadi's leach test results were derived using unreliable methodology. However, JM's reliability arguments appear to be directed at Azadi's comparability study. JM does not contend that Azadi's leach test, which followed the British Standard protocols except as to sample size, is not reproducible or is unreliable. JM only argues that Azadi's leach test results

10

cannot reliably be described as the results of a British Standard or equivalent test. For that reason, at this stage, the Court **denies** JM's request to exclude Azadi's leach test results as unreliable.

## IV. CONCLUSION

For the reasons stated above, JM's Motion to Exclude the Opinions of Parastoo Azadi, Ph.D. ([Filing No. 929](Filing No. 929)) is **GRANTED in part and DENIED in part**. Azadi is not precluded from testifying that chemical compounds she identified in JM's accused products could be melanoidins and/or chemical intermediates that are formed in pathways that produce melanoidins based on prior literature in the field; or from testifying about her leach test data results. However, Azadi is precluded from opining as to whether, or the likelihood that, the chemical compounds she identified in JM's accused products are melanoidins and/or chemical intermediates that are formed in pathways that produce melanoidins; she is precluded from testifying that her leach test data results came from performing the British standard BS EN 12457-2 at L/S 10 leach test or an equivalent test; and she is precluded from testifying about her "comparability study."

An order *in limine* is not a final, appealable order. If the parties believe that evidence excluded by this Order becomes relevant or otherwise admissible during the course of the trial, counsel may request a hearing outside the presence of the jury. Likewise, if the parties believe that specific evidence is inadmissible during the course of the trial, counsel may raise specific objections to that evidence.

Because of the nature of some of the matters in this Order, this Order shall be **docketed as a SEALED order**, accessible only to the Court and the parties. The parties are **ordered** to confer and agree on a redacted version of this Order that can be filed on the public docket within **fourteen (14) days** of this Entry.

**SO ORDERED**.

Date: 3/29/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

11

DISTRIBUTION:

Brett J. Arnold
QUINN EMANUEL URQUHART & SULLIVAN LLP
brettarnold@quinnemanuel.com

Melissa J. Baily
QUINN EMANUEL URQUHART & SULLIVAN, LLP
melissabaily@quinnemanuel.com

Brent R. Baughman
DENTONS BINGHAM GREENEBAUM LLP (Louisville)
brent.baughman@dentons.com

Kevin M. Bell
KILPATRICK TOWNSEND & STOCKTON LLP
kbell@kilpatricktownsend.com

Spiro Bereveskos
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
judy@uspatent.com

A. Richard M. Blaiklock
LEWIS WAGNER, LLP
rblaiklock@lewiswagner.com

Briana Lynn Clark
DENTONS BINGHAM GREENEBAUM LLP (Indianapolis)
briana.clark@dentons.com

Lindsay Cooper
QUINN EMANUEL URQUHART & SULLIVAN, LLP
lindsaycooper@quinnemanuel.com

Hannah Elizabeth Dawson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
hannahdawson@quinnemanuel.com

Duane R. Denton
DENTONS BINGHAM GREENEBAUM LLP (Indianapolis)
rusty.denton@dentons.com

David D. Doak
QUINN EMANUEL URQUHART & SULLIVAN, LLP
daviddoak@quinnemanuel.com

Jaclyn Michelle Flint
RILEY BENNETT EGLOFF LLP
jflint@rbelaw.com

Matthew M. Gardlik
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
mgardlik@uspatent.com

Meaghan Klem Haller
DENTONS BINGHAM GREENEBAUM LLP (Indianapolis)
meaghan.haller@dentons.com

Ella K. Hallwass
QUINN EMAUEL URGUHART & SULLIVAN LLP
ellahallwass@quinnemanuel.com

Blake R. Hartz
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
bhartz@uspatent.com

Valerie Anne Lozano, I
QUINN EMANUEL URQUHART& SULLIVAN
valerielozano@quinnemanuel.com

Daniel James Lueders
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
lueders@uspatent.com

Brice C. Lynch
QUINN EMANUEL URQUHART & SULLIVAN, LLP
bricelynch@quinnemanuel.com

Duane Lyons
QUINN EMANUEL URQUHART & SULLIVAN
duanelyons@quinnemanuel.com

Edward J. Mayle
KILPATRICK TOWNSEND & STOCKTON LLP
TMayle@kilpatricktownsend.com

Kristopher L. Reed
KILPATRICK TOWNSEND & STOCKTON LLP
kreed@kilpatricktownsend.com

James W. Riley, Jr.
RILEY BENNETT EGLOFF LLP
jriley@rbelaw.com

Owen Fullerton Roberts
QUINN EMANUEL URQUHART & SULLIVAN LLP
owenroberts@quinnemanuel.com

Charles Verhoeven
QUINN EMANUEL URQUHART & SULLIVAN, LLP
charlesverhoeven@quinnemanuel.com

Scott Watson
QUINN EMANUEL URQUHART OLIVER & HEDGES
scottwatson@quinnemanuel.com

Travis D. Whitsitt
KILPATRICK TOWNSEND & STOCKTON LLP
twhitsitt@kilpatricktownsend.com

Lance Yang
QUINN EMANUEL URQUHART & SULLIVAN, LLP
lanceyang@quinnemanuel.com