UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KNAUF INSULATION, LLC,<br>KNAUF INSULATION GmbH,<br>KNAUF INSULATION SPRL,<br><br>    Plaintiffs,<br><br>    v.<br><br>JOHNS MANVILLE CORPORATION,<br>JOHNS MANVILLE, INC.,<br><br>    Defendants.<br>_____<br><br>JOHNS MANVILLE CORPORATION,<br>JOHNS MANVILLE, INC.,<br><br>    Counter Claimants,<br><br>    v.<br><br>KNAUF INSULATION GmbH,<br>KNAUF INSULATION SPRL,<br>KNAUF INSULATION, LLC,<br><br>    Counter Defendants. | Case No. 1:15-cv-00111-TWP-MJD |

**SEALED ORDER ON PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE
CERTAIN OPINIONS AND TESTIMONY OF DR. FREDERICK HIRSEKORN**

This matter is before the Court on Plaintiffs Knauf Insulation LLC, Knauf Insulation GmbH, and Knauf Insulation SPRL's (collectively, "Knauf") Motion in *Limine* to Exclude Certain Opinions and Testimony of Dr. Frederick Hirsekorn ("Hirsekorn") ([Filing No. 926](#)). Knauf seeks to preclude Hirsekorn from offering opinions as to whether prior art references disclose certain claim limitations and whether the claimed inventions are obvious. For the following reasons, Knauf's Motion in *Limine* is **denied**.

# I. BACKGROUND

Knauf and Defendants Johns Manville Corporation and Johns Manville, Inc. (collectively, "JM") are competitors in the U.S. market for fiberglass insulation products. Knauf initiated this patent infringement action against JM, alleging JM has violated and is continuing to violate the patent laws of the United States by infringing Knauf's U.S. Patents. JM has challenged the validity of those patents and intends to call Hirsekorn, a chemistry expert, to testify as to the alleged invalidity of Knauf's patents. Based on his report, Hirsekorn is expected to testify in part that prior art references disclose the claimed inventions' limitations regarding formaldehyde and the concentration of certain ionic species as assessed by a "leach test," and that some or all of the claimed inventions are obvious under 35 U.S.C. § 103.

# II. LEGAL STANDARD

"[J]udges have broad discretion in ruling on evidentiary questions during trial or before on motions in *limine*." *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). The Court excludes evidence on a motion in *limine* only if the evidence clearly is not admissible for any purpose. *See Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). Unless evidence meets this exacting standard, evidentiary rulings must be deferred until trial so questions of foundation, relevancy, and prejudice may be resolved in context. *Id.* at 1400–01. Moreover, denial of a motion in *limine* does not necessarily mean that all evidence contemplated by the motion is admissible; rather, it only means that, at the pretrial stage, the Court is unable to determine whether the evidence should be excluded. *Id.* at 1401. "The purpose of a motion in *limine* is not to weigh competing arguments about the strength of the parties' evidence and theories, nor is it to decide which party's assumptions are correct. A motion in *limine* weeds out evidence that is not admissible for any purpose." *Wash. Frontier League Baseball, LLC v. Zimmerman*, No. 14-cv-01862, 2018 WL 3120623, at *2 (S.D. Ind. June 26, 2018).

Federal Rule of Evidence 702 governs testimony of expert witnesses. An expert may testify regarding the ultimate issue in a case. Fed. R. Evid. 704(a). Furthermore, an expert can base her opinion on inadmissible evidence. Fed. R. Evid. 703. However, "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

"Under the *Daubert* gatekeeping requirement, the district court has a duty to ensure that expert testimony offered under Federal Rule of Evidence 702 is both relevant and reliable." *Jenkins v. Bartlett*, 487 F.3d 482, 488–89 (7th Cir. 2007) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "Whether proposed expert testimony is sufficiently reliable under Rule 702 is dependent upon the facts and circumstances of the particular case." *Id.* at 489. The Court is given "latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citing *Jenkins*, 487 F.3d at 489).

"In determining reliability, *Daubert* sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the scientific community." *Id* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)). "The court should also consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion." *Id.*

> Since the gatekeeping inquiry must be tied to the facts of the particular case, . . . a trial court may - but is not required to - consider "one or more of the more specific factors that *Daubert* mentioned when doing so will help determine the testimony's reliability." But, the [Supreme] Court stressed, those factors, which were meant "to be helpful, not definitive," "neither necessarily nor exclusively apply to all experts or in every case." Their applicability will depend on "'the nature of the issue, the

3

expert's particular expertise, and the subject of his testimony.'" The procedure employed will depend largely on the "particular circumstances of the particular case at issue."

*Richman v. Sheahan*, 415 F. Supp. 2d 929, 934 (N.D. Ill. 2006) (quoting *Kumho Tire*, 526 U.S. at 142, 150, 152).

Additionally, the district court must determine whether the proposed expert testimony will assist the trier of fact in determining a fact in issue or understanding the evidence. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616.

> Vigorous cross examination, presentation of contrary evidence and careful jury instructions . . . are the traditional and appropriate means of attacking shaky but admissible evidence. The rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.

*Richman*, 415 F. Supp. 2d at 933 (citations and quotation marks omitted).

Seventh Circuit law governs this Motion in *Limine*, as opposed to Federal Circuit law, because the admission of expert witnesses is a procedural matter and is not unique to patent law. *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1358 (Fed. Cir. 2006); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

### III. DISCUSSION

Knauf's Motion in *Limine* requests that the Court preclude Hirsekorn's testimony on three topics. First, it seeks to preclude Hirsekorn from offering opinions as to whether prior art references disclose the claim limitations "formaldehyde free" or "substantially formaldehyde free" (the "formaldehyde claim limitations"). Second, it seeks to preclude opinions regarding whether prior art references disclose the claim limitation "wherein finished material comprises residual levels of more than 500 mg of ionic species per kg of finished material . . . in which the residual

4

levels are assessed in a leach test" (the "leach test claim limitation"). Third, it seeks to preclude Hirsekorn's opinions regarding the alleged obviousness of the claimed inventions. The Court will address each request in turn.

A.        **Formaldehyde Claim Limitations**

Knauf first argues that Hirsekorn should be precluded from offering opinions as to whether prior art references disclose the formaldehyde claim limitations. The parties agree that the limitation "formaldehyde free" should be construed as: "A binder or a material that incorporates a binder liberates less than 1 ppm (parts per million) formaldehyde as a result of drying and/or curing, where the ppm is based on the weight of sample being measured for formaldehyde release." (Filing No. 819 at 150–51; Filing No. 843 at 78 n.19). The parties also agree that the limitation "substantially formaldehyde free" should be construed as: "A binder or a material that incorporates a binder liberates less than 5 ppm formaldehyde as a result of drying and/or curing, where the 5 ppm is based on the weight of sample being measured for formaldehyde release." (Filing No. 819 at 23–24; Filing No. 843 at 78 n.19). Although the Court has not yet ruled on the parties' claim constructions, the Court adopts these agreed constructions only for purposes of the instant Motion in *Limine*.

Knauf argues that Hirsekorn's opinions on the formaldehyde claim limitations are unreliable because Hirsekorn "did not apply the undisputed claim construction and did not meet JM's burden to show by clear and convincing evidence the presence of these claim limitations in the alleged prior art (Filing No. 926 at 2). The Court does not find that Hirsekorn's testimony should be precluded for either of those reasons.

First, Hirsekorn did apply the agreed claim constructions in his report. Although his report primarily argued that the formaldehyde claim limitations are indefinite, Hirsekorn alternatively considered the same prior art assuming the claim limitations are given Knauf's proposed

5

constructions, which are the parties' agreed constructions (Filing No. 926-2 at ¶ 776). Hirsekorn more specifically opines that the formaldehyde claim limitations would be met if the prior art disclosed a binder that: (1) shows less than one or five parts per million, respectively, in a curing test; (2) has less than one or five parts per million, respectively, in its final product; (3) is described as formaldehyde free; or (4) does not have formaldehyde as a raw material. *Id.* JM argues that although the third and fourth definitions depart from the agreed claim constructions, they inherently disclose the claim limitations under the agreed constructions (Filing No. 947 at 6 n.1 ("If a reference discloses that it is 'formaldehyde free,' then it would necessarily mean that the binder and/or product would not liberate any formaldehyde as a result of drying and/or curing," and that if a reference discloses that formaldehyde is not an ingredient in the binder, then a [person of ordinary skill in the art] could understand that to be formaldehyde free."). A prior art reference may disclose a claim limitation either expressly or inherently. *See Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

Second, Knauf argues that Hirsekorn's opinions should be excluded because the cited prior art references do not inherently disclose the formaldehyde claim limitations (Filing No. 926 at 6–7; Filing No. 962 at 3–7). An inherent disclosure occurs "only when the reference discloses prior art that must *necessarily* include the unstated limitation." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002) (emphasis in original). "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient." *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir. 1991) (emphasis in original). Knauf argues that Hirsekorn did not test the prior art samples to determine if they in fact meet the formaldehyde claim limitations, and

argues that Hirsekorn's own testimony confirms that the prior art samples do not necessarily meet those limitations.

In response, JM argues that Hirsekorn was not required to test the prior art samples, and that the prior art cited by Hirsekorn "only needs to provide enough disclosure to a [person of ordinary skill in the art ("POSITA")] for a POSITA to know that the references disclosed binders and/or products that would release less than 1 and/or 5 ppm of formaldehyde if tested" (Filing No. 947 at 6).

Both parties are partially correct. Knauf is correct that the prior art references do not meet the claim limitations if Hirsekorn, or another POSITA, concludes that the prior art references would *probably* meet the claim limitations. To satisfy the standard for inherency, the prior art references must *necessarily* meet the claim limitations. JM is correct that Hirsekorn was not required to test the prior art samples. Hirsekorn may properly opine on inherent disclosure if, based on his analysis, the prior art samples necessarily meet the claim limitations.

Hirsekorn appropriately analyzed the cited prior art references with respect to inherent disclosure of claim limitations. Knauf's arguments that the cited prior art samples in fact do not inherently disclose the claim limitations or fail to carry JM's burden of proof speak to the weight of Hirsekorn's testimony, not its admissibility.

> A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."

*Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596); *see Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is

a factual one that is left for the jury to determine . . . . It is not the trial court's role to decide whether an expert's opinion is correct.").

Hirsekorn's opinions are relevant to one or more of JM's defenses in this case and reliably apply the parties' agreed claim constructions and the correct test for inherent disclosure. Hirsekorn's testimony therefore passes the *Daubert* threshold. Further, the Court concludes that Hirsekorn's testimony on prior art references and claim limitations would be helpful to a jury in this complex trial, and that the risk of jury confusion does not substantially outweigh the probative value of Hirsekorn's testimony. Any jury confusion can be alleviated through cross-examination and appropriate instructions.

At this stage, the Court **denies** Knauf's request to preclude Hirsekorn's testimony offering opinions as to whether prior art references disclose the formaldehyde claim limitations.

**B.     Leach Test Claim Limitation**

Knauf next seeks to preclude Hirsekorn from offering any opinions as to whether prior art references disclose the leach test claim limitation. Some or all of the asserted patents contain the claim limitation: ". . . wherein the finished material comprises residual levels of more than 500 mg of ionic species per kg of finished material, said species selected from the group consisting of sulfates, phosphates, nitrates, carbonates and combinations thereof in which the residual levels are assessed in a leach test."  (Filing No. 1-2 at 14; Filing No. 60-1 at 14). In his expert report, Hirsekorn opines that certain prior art references disclose the leach test claim limitation.  Knauf claims those opinions are unreliable for two reasons.

First, Knauf contends that Hirsekorn's opinions are not based on leach tests of the prior art binder samples and are instead based on "guesses" and "sho[ts] in the dark" (Filing No. 926 at 8–9).  JM again responds that Hirsekorn is not required to test the prior art binder samples to opine that the prior art samples inherently disclose the leach test limitation (Filing No. 947 at 8). As

8

discussed above, JM is correct. JM asserts that Hirsekorn performed calculations based on the binder formulas for the prior art and, based on those calculations, properly concluded that all prior art references disclose the requisite residual levels of ionic species as assessed in a leach test (Filing No. 947 at 8–9). JM explains that the "guessing" referred to by Knauf is Hirsekorn's "prediction" as to residual amounts of ionic species in the prior art finished products, not the residual amounts as assessed in a leach test. *Id.* at 9. Similarly, Hirsekorn's reference to "shooting in the dark" during his deposition relates to his belief that leach tests are generally unreliable, not his calculations based on the prior art binder formulas. In context, Hirsekorn was testifying that because "[t]here's too much uncertainty about what actually leaches out or can leach out" and because "[t]here's so many different leach tests that are vague and indeterminate . . . you're really shooting in the dark when you try to guess that [*sic*] what is in there and what will come out" (Filing No. 926-3 at 6).

The Court finds that Hirsekorn's calculations based on the prior art binder formulas are not unreliable. Hirsekorn was not required to test the prior art samples to offer his opinions on inherent disclosure, and Knauf is not challenging the specific methodology Hirsekorn used in forming those opinions. Knauf instead challenges Hirsekorn's methodology based on deposition testimony excerpts, which, in context, are unrelated to the reliability of Hirsekorn's calculations or conclusions.

Second, Knauf argues that Hirsekorn's opinions regarding two prior art references, "Stofko" and "Gogek," are unreliable because Hirsekorn did not label the Stofko and Gogek binder samples he used prior to testing them (Filing No. 926 at 8–10). Hirsekorn's report contains data for ten mat samples of the Stofko and Gogek binders (Filing No. 947 at 12), but Hirsekorn did not label the ten binder samples before testing them, so he does not know which line of mat sample

9

data corresponds with which binder sample. In short, Hirsekorn cannot say which Stofko or Gogek sample yielded what results. Knauf argues that Hirsekorn's experiments are therefore impossible to replicate and thus unreliable.

JM argues Hirsekorn's conclusions should not be excluded because Hirsekorn's methodology was reliable and reproducible, even if the Stofko and Gogek samples were not labeled ([Filing No. 947 at 13](#)). Additionally, JM contends that the specific identity of the samples are immaterial for purposes of Hirsekorn's testimony. *Id.* Hirsekorn is relying on the Stofko and Gogek data only "to confirm his calculations that the prior art binders disclose the 'leach test' limitations." Because all ten samples showed "residual levels of more than 500 mg of ionic species per kg of finished material," the data reliably confirms Hirsekorn's calculations, even without knowing which sample yielded what data. *Id.* at 13–14. On reply, Knauf argues that "forgetting to label the samples . . . is an elementary mistake and calls into question the reliability of his testing as a whole" ([Filing No. 962 at 8](#)). Knauf contends that this mistake leaves Knauf "unable to repeat and thereby challenge his test." *Id.*

The Court again agrees with JM. To the extent Knauf believes Hirsekorn's "elementary" mistake speaks to Hirsekorn's qualifications, that belief is best explored on cross-examination. But Knauf has offered no basis for concluding that Hirsekorn's entire methodology is unreliable. Hirsekorn disclosed his testing methodology, and Knauf does not assert any specific challenge to that methodology or explain why its own experts could not repeat Hirsekorn's experiments using that methodology. Additionally, Knauf remains able to challenge Hirsekorn's data and conclusions, despite not knowing which sample yielded what data. Hirsekorn is relying on the data to support his conclusion that all of the prior art samples meet the threshold concentration of ionic species in the leach test limitation. In theory, if one of Knauf's experts reproduces Hirsekorn's experiment,

and any one sample reveals residual levels less than the threshold concentration of ionic species, then that evidence could challenge Hirsekorn's data and his conclusions based on that data.

Hirsekorn's leach test claim limitation opinions are relevant to one or more of JM's defenses in this case, and Knauf has not shown that Hirsekorn's leach test calculations and experiments are unreliable. At this stage, the Court **denies** Knauf's request to preclude Hirsekorn's testimony offering opinions as to whether prior art references disclose the leach test claim limitation.

### C. Obviousness

Knauf lastly seeks to preclude Hirsekorn from offering any opinions regarding the alleged obviousness of the claimed inventions, arguing that Hirsekorn used two incorrect legal standards in his obviousness analysis. Knauf first contends Hirsekorn improperly considered "one in a million" to be a "reasonable expectation of success," and second, Knauf contends Hirsekorn improperly relied on the "essence" or "gist" of the claimed inventions (Filing No. 926 at 2).

#### 1. "Reasonable Expectation of Success"

Under 35 U.S.C. § 103, "a claimed invention is unpatentable if the differences between it and the prior art 'are such that the subject matter as a whole would have been obvious at the time the invention is made to a person having ordinary skill in the art.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F3d 1348, 1361 (Fed. Cir. 2007). If the claimed patent's limitations are found in a number of prior art references, then the party challenging the patent must show by clear and convincing evidence that a POSITA "would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, *and that the skilled artisan would have had a reasonable expectation of success in doing so*." *Id.* (emphasis added) (citing *Dystar Textilfarben GmbH v. C.H. Patrick CO.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

According to Knauf, Hirsekorn's deposition testimony shows he improperly considered a "one in a million" chance to be a "reasonable expectation of success" in his obviousness analysis (Filing No. 926 at 11–12). Knauf relies on the following portion of Hirsekorn's testimony:

> I mean, if we take, for example, binder development here for fiberglass, it doesn't take a whole lot . . . to go from, like, shell bones to a product.
>
> . . .
>
> So in that case the expectation of success could be one in a million, and it's still something I would try because it's so simple to do, to go from a shell bone to viable binder.

(Filing No. 926-3 at 4).

The Court disagrees with Knauf for the reasons asserted by JM. The above deposition excerpt, in context, is unrelated to Hirsekorn's obviousness analysis. The discussion leading up to Hirsekorn's "one in a million" statement began with one of Knauf's attorneys asking about the "conception" of an invention. *Id.* at 3. Knauf's attorney shortly thereafter asks "*In this area, . . . as the inventor needs to test things, how does that play into the reasonable expectation of success?*" *Id.* (emphasis added). Hirsekorn answers that "an invention, by its very nature, is something that nobody's anticipated or doesn't know if it's going to work. It's new. And so a reasonable expectation of success is based on somebody's experience or whatever." Hirsekorn goes on to explain that in deciding whether to test a new invention, he would weigh the difficulty of testing the invention against the likelihood of success. *Id.* at 3–4. Hirsekorn gives two examples:

> [F]or example, binder development here for fiberglass . . . doesn't take a whole lot . . . to go from, like, shell bones to a product . . . . So in that case the expectation of success could be one in a million, and it's still something I would try because it's so simple to do, to go from a shell bone to a viable binder.
>
> …
>
> If you were telling me I've gotta design a silicone chip for the electronic industry and I need to develop a material with certain properties, I would say your suggestion

has to be pretty close to right on target because the testing there is unbelievably complicated.

*Id.* at 4.

With that context in mind, Hirsekorn's "one in a million" statement plainly refers to conception and the decision to test new inventions. It does not, as Knauf claims, relate to the "reasonable expectation of success" a POSITA would have in applying prior art references to achieve a preexisting invention. Hirsekorn's statement does not warrant the exclusion of his obviousness opinions.

On reply, Knauf also argues that Hirsekorn did not address the "reasonable expectation of success" in the section of his report explaining the legal standard for obviousness, so his deposition necessarily provides "the only disclosures as to his understanding of what may be considered a 'reasonable expectation of success'" (Filing No. 962 at 9–10). But even though Hirsekorn does not explain the "reasonable expectation of success" standard in the "Legal Standard for Obviousness" section of his report, that does not mean the Court may misattribute one of Hirsekorn's statements, made in a different context, to his understanding of the "reasonable expectation of success" standard for obviousness.

Knauf has not shown that Hirsekorn's obviousness testimony relies on an improper understanding of "reasonable expectation of success," so the Court declines to preclude Hirsekorn's obviousness testimony on that basis.

### 2. Reliance on "Essence" or "Gist" of Claimed Inventions

Knauf argues that the Court should preclude Hirsekorn's obviousness testimony because it improperly relies on the "essence" or "gist" of the claimed inventions (Filing No. 962 at 12). "It is well settled that 'there is no legally recognizable or protected "essential" element, gist, or "heart" of the invention in a combination patent.' Rather, '"[t]he invention" is defined by the claims.'" *Allen*

13

*Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002) (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345 (1961), *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1565 (Fed. Cir. 1991)). An obviousness analysis must consider the claimed invention "as a whole." 35 U.S.C. § 103.

Knauf again relies on excerpts from Hirsekorn's deposition. During his deposition, Hirsekorn was asked "You think it's proper to rely on the essence of the invention in your invalidity opinion?" and Hirsekorn responded "Well, I think that's where you start and you work from that concept." (Filing No. 926 at 13–14). Hirsekorn was also asked "When you were doing your analysis for the obviousness opinions, did you rely on your understanding of the essence of the invention?" to which he answered "Well, yes." *Id.* at 14.

JM responds that Hirsekorn's deposition testimony has again been taken out of context. JM explains that although Hirsekorn considered the essence of the claimed inventions in forming his opinions, he properly considered each claim on a limitation-by-limitation basis (Filing No. 947 at 16). In reply, Knauf asserts that if "Hirsekorn used an improper starting point[, then] no amount of after-the-fact discussion can cure this defect." (Filing No. 962.) However, Knauf fails to cite any authority supporting the proposition that an obviousness analysis is improper if it starts with a consideration of the invention's essence, even if the analysis is ultimately based on a consideration of all claim limitations. In *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1448 (Fed. Cir. 1984), the Federal Circuit held that the district court erred by considering the essence of only some of the claim limitations in its obviousness analysis and stated that "the obviousness issue must start with the claimed invention *as a whole*." *Id.* (emphasis in original). There, the Federal Circuit emphasized that an obviousness analysis must consider all claim limitations, which Hirsekorn's analysis did. Nothing in the *Kimberly-Clark Corp.* opinion, or any other case cited by

14

Knauf, holds that "[i]f the starting point is improper, then the rest of the analysis is flawed." (Filing No. 962 at 12.)

Hirsekorn's report properly addresses each of the claim limitations and does not opine that the "essence" of the claimed inventions are obvious. Accordingly, Knauf has not shown that Hirsekorn's obviousness testimony should be precluded for improperly relying on the "gist" or "essence" of the claimed inventions.

Knauf relatedly argues that the Court should exclude the penultimate section of Hirsekorn's report, Section XIV titled "There is Nothing Inventive Regarding Knauf's Sugar Based Binders," because it is conclusory, "disembodied from any claim language," and would confuse the issues and mislead the jury (Filing No. 926 14–15). JM points out that this section of the report incorporates by reference the much more detailed analysis found earlier in the report and, as Knauf notes, contains only Hirsekorn's "bottom line" (Filing No. 947 at 17). The Court agrees with JM. Section XIV does contain conclusions, but it is not conclusory. To the extent Hirsekorn's use of non-claim terms, like 'sugar based binder" in his conclusion, any such confusion could be alleviated through vigorous cross-examination and instructions.

The Court **denies** Knauf's request to preclude Hirsekorn from offering opinions regarding the alleged obviousness of the claimed inventions.

## IV.   CONCLUSION

For the reasons stated above, Knauf's Motion in *Limine* to Exclude Certain Opinions and Testimony of Dr. Frederick Hirsekorn (Filing No. 926) is **DENIED**. An order in *limine* is not a final, appealable order. If the parties believe that evidence excluded by this Order becomes relevant or otherwise admissible during the course of the trial, counsel may request a hearing outside the presence of the jury. Likewise, if the parties believe that specific evidence is inadmissible during the course of the trial, counsel may raise specific objections to that evidence.

Because of the nature of some of the matters in this Order, this Order shall be **docketed as a SEALED order**, accessible only to the Court and the parties. The parties are **ordered** to confer and agree on a redacted version of this Order that can be filed on the public docket within **fourteen (14) days** of this Entry.

    **SO ORDERED**.

Date: 3/31/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Brett J. Arnold
QUINN EMANUEL URQUHART & SULLIVAN LLP
brettarnold@quinnemanuel.com

Melissa J. Baily
QUINN EMANUEL URQUHART & SULLIVAN, LLP
melissabaily@quinnemanuel.com

Brent R. Baughman
DENTONS BINGHAM GREENEBAUM LLP (Louisville)
brent.baughman@dentons.com

Kevin M. Bell
KILPATRICK TOWNSEND & STOCKTON LLP
kbell@kilpatricktownsend.com

Spiro Bereveskos
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
judy@uspatent.com

A. Richard M. Blaiklock
LEWIS WAGNER, LLP
rblaiklock@lewiswagner.com

Briana Lynn Clark
DENTONS BINGHAM GREENEBAUM LLP (Indianapolis)
briana.clark@dentons.com

Lindsay Cooper
QUINN EMANUEL URQUHART & SULLIVAN, LLP
lindsaycooper@quinnemanuel.com

Hannah Elizabeth Dawson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
hannahdawson@quinnemanuel.com

Duane R. Denton
DENTONS BINGHAM GREENEBAUM LLP (Indianapolis)
rusty.denton@dentons.com

David D. Doak
QUINN EMANUEL URQUHART & SULLIVAN, LLP
daviddoak@quinnemanuel.com

Jaclyn Michelle Flint
RILEY BENNETT EGLOFF LLP
jflint@rbelaw.com

Matthew M. Gardlik
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
mgardlik@uspatent.com

Meaghan Klem Haller
DENTONS BINGHAM GREENEBAUM LLP (Indianapolis)
meaghan.haller@dentons.com

Ella K. Hallwass
QUINN EMAUEL URGUHART & SULLIVAN LLP
ellahallwass@quinnemanuel.com

Blake R. Hartz
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
bhartz@uspatent.com

Valerie Anne Lozano, I
QUINN EMANUEL URQUHART& SULLIVAN
valerielozano@quinnemanuel.com

Daniel James Lueders
WOODARD EMHARDT HENRY REEVES & WAGNER, LLP
lueders@uspatent.com

Brice C. Lynch
QUINN EMANUEL URQUHART & SULLIVAN, LLP

bricelynch@quinnemanuel.com

Duane Lyons
QUINN EMANUEL URQUHART & SULLIVAN
duanelyons@quinnemanuel.com

Edward J. Mayle
KILPATRICK TOWNSEND & STOCKTON LLP
TMayle@kilpatricktownsend.com

Kristopher L. Reed
KILPATRICK TOWNSEND & STOCKTON LLP
kreed@kilpatricktownsend.com

James W. Riley, Jr.
RILEY BENNETT EGLOFF LLP
jriley@rbelaw.com

Owen Fullerton Roberts
QUINN EMANUEL URQUHART & SULLIVAN LLP
owenroberts@quinnemanuel.com

Charles Verhoeven
QUINN EMANUEL URQUHART & SULLIVAN, LLP
charlesverhoeven@quinnemanuel.com

Scott Watson
QUINN EMANUEL URQUHART OLIVER & HEDGES
scottwatson@quinnemanuel.com

Travis D. Whitsitt
KILPATRICK TOWNSEND & STOCKTON LLP
twhitsitt@kilpatricktownsend.com

Lance Yang
QUINN EMANUEL URQUHART & SULLIVAN, LLP
lanceyang@quinnemanuel.com